UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

SHAWNA PATRICE HERNANDEZ,

                    Plaintiff,

                                              **NOT FOR PUBLICATION**

          -against-

                                              <u>**MEMORANDUM & ORDER**</u>

MICHAEL J. ASTRUE,                            10-CV-0234 (KAM)

Commissioner of Social Security,

                    Defendant.

----------------------------------------X

**MATSUMOTO, United States District Judge:**

          Pursuant to 42 U.S.C. section 405(g), plaintiff Shawna

Hernandez ("plaintiff") appeals the final decision of defendant

Commissioner of Social Security Michael Astrue ("defendant" or

the "Commissioner"), who denied plaintiff's application for

Supplemental Security Income ("SSI") and Social Security

Disability ("SSD") under Title XVI of the Social Security Act

(the "Act").[1]  Proceeding *pro se*,[2] plaintiff contends that she is

entitled to receive SSI and SSD benefits due to severe medically

determinable impairments, including "depression, anxiety, panic

---

[1]    Individuals may seek judicial review in the United States district
court for the judicial district in which they reside over any final decision
of the Commissioner of Social Security rendered after a hearing to which they
were a party, within sixty days after notice of such decision or within such
further time as the Commissioner may allow.  <u>See</u> 42 U.S.C. § 405(g).

[2]    Although plaintiff filed her complaint *pro se*, she has since obtained
counsel.  (<u>See</u> ECF No. 1, Complaint ("Compl.") dated 1/8/2010; <u>see also</u> ECF
No. 22, Notice of Appearance dated 3/25/2011.)

disorder and anemia," which she alleges render her disabled and have prevented her from performing any work since December 8, 2006. (see generally Compl.)  Presently before the court is defendant's unopposed[3] motion for judgment on the pleadings, filed on October 27, 2010.  (See ECF No. 17, Defendant's Motion for Judgment on the Pleadings ("Def. Mot.") dated 10/27/2010.) For the reasons set forth below, defendant's motion is denied and the case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

### I. Plaintiff's Personal and Employment History

Plaintiff was born on August 2, 1974 in New York City. (Tr. 21, 75, 93.)[4]  Plaintiff graduated high school and subsequently received special job training as a bartender in 1992.  (Id. at 109, 110.)  From 1992 through 2002, plaintiff worked as a waitress and bartender at Hooter's restaurant in Staten Island, New York for seven hours a day, four days per week.  (Id. at 96-98, 106, 186.)  In this role, plaintiff took

---

[3]    As explained *infra*, plaintiff twice failed to timely oppose or make any response to defendant's motion, but five months after the deadline for opposing the motion had passed, and when this matter was already *sub judice*, made a belated request for an extension of time within which to respond. (See ECF Nos. 23 and 24, Letters on behalf of plaintiff dated 3/25/2011 and 3/30/2011 ("Pl. March 2011 Ltrs.").)  This request was denied by the court. (See Order dated 4/1/2011 denying Motion for Extension of Time to File ("4/1/2011 Order").)

[4]    Citations to the administrative record, (1-207), are indicated by the abbreviation "Tr."

orders, talked to customers, cleaned tables, brought trays of food, prepared checks, and retrieved supplies.  (Id. at 106.)

Plaintiff moved to California in August 2002.  (Id. at 186.)  While living in California, plaintiff heavily abused alcohol and reported drinking two forty ounce beers during the day and one to two pints of vodka at night.  (Id. at 27, 167.) Also while in California, plaintiff's two older children were taken from her by court order.[5]  (Id. at 27.)

From March to December 2006, plaintiff was self-employed as a manicurist, hair stylist, and babysitter.  (Id. at 96, 98.)  As a manicurist, plaintiff "did manicures, . . . applied nail tips, and polished nails."  (Id. at 98.)  As a babysitter, plaintiff fed, played with, and read to children. (Id.)  In 2006, plaintiff reported that she stopped working after becoming abusive to one of her clients.  (Id. at 26.) Plaintiff further reported that at the time she stopped working, she would "just get physical" if she had to interact with people.  (Id.)  According to plaintiff, she stopping working because "her symptoms got too bad, she was in an abusive relationship and her husband" abandoned her in California.  (Id. at 105.)

---

[5]    According to the Administrative Record, plaintiff has four children under the age of 18.  (See Tr. 21, 27, 187.)

3

Plaintiff moved back to Staten Island, New York from California around December 2006. (Id. at 96, 156.) Plaintiff stopped drinking between February 2007 and March 13, 2007. (Id. at 28, 29, 129, 167, 179, 186.) At the time she filed for disability benefits on June 7, 2007, plaintiff was seven months pregnant and living with her sister, cousin, nephews, and eight-year-old daughter in Staten Island, New York. (Id. at 119.) Plaintiff gave birth to her fourth child in or around September 2007. (Id. at 129.)

On January 12, 2009, plaintiff testified before the ALJ that, at that time, she was living in her sister's home with two of her children, ages one and ten. (Id. at 21.) Plaintiff further reported that her sister would help feed, bathe, and clothe plaintiff's one-year-old child. (Id. at 22.) Plaintiff also reported spending most days in bed unless she needed to go to a doctor's appointment. (Id. at 22, 28.) Plaintiff testified that she did not think she could perform simple repetitive work at that time. (Id. at 28.)

## II. Plaintiff's Medical History

### A. March 1 and March 6, 2007: St. George Hospital Visits

On March 1, 2007, plaintiff was admitted to the Behavior Health Service Division at Richmond University Hospital, Staten Island, New York. (Id. at 155.) From there,

4

plaintiff was referred to the St. George Mental Illness Chemical Addiction Program ("St. George").  (Id. at 155-56.)

According to a March 6, 2007 assessment[6] prepared by social worker Domenica Fratto ("Ms. Fratto") and reviewed by physician Dr. Leonid Izrayelit ("Dr. Izrayelit"), plaintiff had been referred for treatment of anxiety, depression, and alcohol use.  (Id. at 155-56.)  During plaintiff's March 6, 2007 assessment by Ms. Fratto, who became plaintiff's primary therapist, plaintiff reported heavy alcohol abuse during the past four years, when she would frequently drink herself to sleep.  (Id. at 156.)  Plaintiff stated that she had stopped drinking eight days prior to the assessment upon learning that she was three months pregnant.  (Id.)

Using the DSM-IV multiaxial scale,[7] Ms. Fratto, as reviewed by Dr. Izrayelit, diagnosed plaintiff with depressive

---

[6]     On a mental status evaluation, Ms. Fratto reported that plaintiff was cooperative and made fair eye contact with normal motor activity.  (Tr. 159.) Ms. Fratto reported that plaintiff's speech was normal and rate was regular. (Id. at 159.)  Ms. Fratto further reported that plaintiff was oriented in all three spheres, and that her long-term memory and fund of knowledge were fair. (Id. at 159.)  Ms. Fratto further reported that plaintiff's intelligence was average.  (Id. at 159.)  Ms. Fratto reported that plaintiff's thought process was coherent and that plaintiff had no delusions, hallucinations, phobias/obsessions, or suicidal/homicidal ideations.  (Id. at 159.)  Ms. Fratto reported that plaintiff's mood was euthymic, affect was full range, and her insight was fair.  (Id. at 159.)

[7]     The DSM-IV multiaxial scale assesses an individual's mental and physical condition on five axes, each of which refers to a different class of information.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders-IV-TR, Front Matter, Multiaxial Assessment (2000 ed.).  Axis I refers to clinical disorders; Axis II refers to personality disorders; Axis III refers to general medical conditions; Axis IV refers to

disorder not otherwise specified ("NOS") and alcohol abuse on

Axis I; no diagnosis on Axis II; three months pregnant on Axis

III; family/primary support, social relationships on Axis IV;

and a GAF of 51 on Axis V.  (Id. at 160.)  Ms. Fratto prescribed

plaintiff weekly individual psychotherapy and group therapy

sessions.  (Id.)  After plaintiff's initial intake, however,

plaintiff did not return for further treatment at St. George,

failed to return for treatment, and failed to respond to patient

outreach services.  (Id. at 164.)  Accordingly, on March 28,

2007, St. George closed plaintiff's case.  (Id.)

### B. April 30 through May 7, 2007: Lenox Hill Hospital Visits

Plaintiff next received treatment at Lenox Hill

Hospital ("Lenox Hill") in New York, New York between April 30

and May 7, 2007.  (Id. 140-46.)  Plaintiff was four to six

months pregnant at the time.  (Id. at 143.)  Upon taking a

Patient Health Questionnaire-9 self-assessment test[8] ("PHQ-9

_____

psychosocial and environmental problems; and Axis V cites the individual's
global assessment of functioning ("GAF").  Id.

[8]     As noted in the Lenox Hill medical record, the PHQ-9 test is used as a
screening device for psychological impairments based on DSM-IV symptom
criteria and ranked on a scale of severity.  (Id. at 143-44.)  The Lenox Hill
record also notes that the PHQ-9 test is a screening device and not to be
used solely to make a depressive disorder diagnosis.  (Id.)  As further noted
by the Lenox Hill record, the questionnaire "relies on patient self-report,"
so a definitive diagnosis must be verified by a clinician, taking into
account how well the patient understood the questions, as well as other
relevant information from the patient, his or her family, and other sources.
(Id.)

test") administered by Social Worker Erika Richman on April 30, 2007, plaintiff received a PHQ-9 Score of 23, which, according to the PHQ-9 scoring guide, indicates that plaintiff was "severe[ly] depress[ed]." (Id. at 143-44.) In a follow-up medical examination at Lenox Hill on May 7, 2007, hospital physician Dr. Clyde Weissbart ("Dr. Weissbart") diagnosed plaintiff with depression and anxiety. (Id. at 145.) According to Dr. Weissbart, plaintiff was not suicidal and had no hallucinations at the time; however, plaintiff felt depressed, was having panic attacks, was not sleeping well, and was becoming easily enraged. (Id.) Dr. Weissbart also noted that plaintiff had reported being depressed for the last five years. (Id.) Plaintiff was not receiving any psychiatric treatment at the time. (Id.) The record does not indicate that plaintiff received further treatment from Lenox Hill after May 7, 2007.

### C. **June 14 and June 28, 2007: Readmission and Treatment at St. George**

On June 14, 2007, plaintiff was re-admitted to St. George. (Id. at 166.) Upon readmission, plaintiff reported that her failure to return for treatment in March 2007 had been due to her lack of proper insurance coverage, which she had since obtained. (Id.) Plaintiff was seven months pregnant at this time. (Id.) On June 14, 2007, licensed social worker Wendy Wullbrandt ("Ms. Wullbrandt") assessed plaintiff's chief

medical complaints, history of present illness, alcohol abuse history, past treatment, medical history, mental status, and psychosocial status.[9] (Id. at 165-74.) Using the DSM-IV multiaxial scale, Ms. Wullbrandt diagnosed plaintiff with bipolar disorder NOS and alcohol abuse on Axis I, rule out ("R/O")[10] personality disorder, alcohol dependence, and post traumatic stress disorder; no diagnosis on Axis II; anemia, seven months pregnant, and high cholesterol on Axis III; family/primary support, social relationships, housing, economic, access to health care, medical issues, fixed/limited income, money conflicts with sister, and Medical Health/Social Security Administration issues on Axis IV; and a GAF of 53 on Axis V. (Id. at 170.) These symptoms matched reported symptoms from the March 6, 2007 assessment at St. George. (Id. at 166.) Ms. Wullbrandt recommended for plaintiff readmission to the St.

---

[9]    On a mental status evaluation, Ms. Wullbrandt noted that plaintiff was neatly dressed, with fair eye contact. (Tr. 169.) Ms. Wullbrandt further noted that plaintiff's attitude was somewhat hostile with normal motor activity. (Id. at 169.) Ms. Wullbrandt noted that plaintiff's speech was normal and that plaintiff's rate was regular. (Id.) Ms. Wullbrandt also reported that plaintiff was oriented in all three spheres, plaintiff's long-term memory was fair, her fund of knowledge was good and her intelligence was average. (Id.) Ms. Wullbrandt reported that plaintiff's thought process was coherent and that plaintiff had no delusions, hallucinations, phobias, obsessions, or suicidal/homicidal ideations. (Id. at 169-70.) Ms. Wullbrandt reported that plaintiff's mood was depressed and angry. (Id. at 170.)

[10]    The term "rule out" is used by medical professionals to mean "eliminate or exclude something from consideration." MedicineNet, _Definition of_ "rule out" (2011), _available at http://www.medterms.com/script/main/art.asp? articlekey=33831_ (last visited on April 29, 2011).

George program, medication assessment, and weekly individual and group psychotherapy sessions.  (Id. at 171, 174.)

On June 28, 2007, Ms. Fratto and Dr. Naeem Akhtar ("Dr. Akhtar") again assessed plaintiff.  (Id. at 176-82.)  The June 28, 2007 assessment was prepared with input from Dr. Idowu, the outpatient director, and again reviewed by Dr. Izrayelit. (Id. at 176, 178.)  In plaintiff's June 28, 2007 St. George medical report, Ms. Fratto and Dr. Akhtar noted that "the patient ha[d] many traits of borderline and antisocial personality disorder and was present[ing] with different psychological symptoms at different stress [levels and] at different times."[11]  (Id. at 178.)  In consultation with Dr. Idowu, and as reviewed by Dr. Izrayelit, Ms. Fratto and Dr. Akhtar diagnosed plaintiff with bipolar disorder NOS and alcohol abuse on Axis I; no diagnosis on Axis II or Axis III; family/primary support, social/relationships on Axis IV; and a GAF score of 55 on Axis V.  (Id. at 177-78, 181.)  Ms. Fratto and Dr. Akhtar further noted that plaintiff had been receiving medication and attending weekly group and individual

---

[11]    On mental status evaluation, Ms. Fratto and Dr. Akhtar noted that plaintiff wore immaculate attire and was appropriate and engaging in affect and behavior.  (Id. at 180.)  Ms. Fratto and Dr. Akhater also reported that plaintiff was oriented in all three spheres, with regular rate and normal quantity.  (Id.)  Ms. Fratto and Dr. Akhtar reported that plaintiff's thought process was coherent and her intelligence was average.  (Id. at 181.)

psychotherapy sessions for two weeks, since June 2007.  (Id. at 178.)

### D. **July 3, 2007: Consultative Examination by Dr. Jung Lee Hahn**

Following plaintiff's June 2007 application for disability benefits, on July 3, 2007 Dr. Jung Lee Hahn ("Dr. Hahn") conducted a consultative examination of plaintiff for the New York State Department of Temporary and Disability Assistance Division of Disability Determinations.  (Id. at 184.)  Dr. Hahn noted plaintiff's ongoing participation in the St. George program and weekly outpatient therapy sessions since March 2007, but noted that plaintiff was not seeing a psychiatrist or taking any psychotropic medications.  (Id. at 185.)  Dr. Hahn noted that plaintiff was taking twenty milligrams of Inderol twice a day for migraine headaches and intended to see a psychiatrist on July 11, 2007.  (Id.)

In a functional description and assessment based upon an interview of plaintiff and plaintiff's existing medical records, Dr. Hahn noted that plaintiff was "capable [of caring] for her daily activities, personal needs, perform[ing] household chores, and shopping."  (Id. at 188.)  Dr. Hahn described plaintiff's daily activities to include caring for her daughter.  (Id. at 186.)  In addition, Dr. Hahn reported that plaintiff had a "limited" "ability to pursue socialization and interests."

10

(Id. at 188.)  Plaintiff reported to Dr. Hahn that, at the time,

she was not socializing and plaintiff denied any hobbies,

interests, or social activities.  (Id. at 186.)  Dr. Hahn opined

that plaintiff was able to manage her funds and relate well to

work-oriented activities as long as her psychiatric condition

was "under control."  (Id. at 188.)  Dr. Hahn noted that

plaintiff reported having abstained from alcohol consumption

since March 2007.  (Id. at 185-86.)

Using the DSM-IV multiaxial scale, Dr. Hahn diagnosed

plaintiff with adjustment disorder with mixed anxiety and

depressed mood as well as alcohol abuse on Axis I; deferred

diagnosis on Axis II; and migraine headaches, anemia, and

dyslipidemia on Axis III.[12]  (Id. at 188.)  In describing

plaintiff's past medical history, Dr. Hahn noted that plaintiff

had previously been diagnosed with "bipolar disorder and

clinical depression."  (Id. at 187.)  Dr. Hahn recommended

treatment, including "vocational occupational [therapy]," and

that plaintiff continue with substance addiction rehabilitation,

---

[12]    According to Dr. Hahn, on mental status evaluation, plaintiff dressed
appropriately, had a cooperative manner and her speech was coherent and
relevant. (Tr. 187.)  Dr. Hahn reported that plaintiff denied delusions,
hallucinations, obsessions, or compulsions. (Id.)  Further, Dr. Hahn
observed that plaintiff was oriented in all three spheres with average
intellectual functioning and that plaintiff's remote and recent memory was
good. (Id. at 188.)  Further, Dr. Hahn reported that plaintiff's attention
span and concentration appeared to be good. (Id.)  Dr. Hahn also reported
that plaintiff denied any suicidal ideas, intentions, or plans. (Id. at
187.)  According to Dr. Hahn, plaintiff's mood was depressed and her affect
appeared dysphoric. (Id. at 187.)  Dr. Hahn reported that plaintiff claimed
she had feelings of anxiousness and distress. (Id.)

psychiatric treatment, and intensive psychotherapy.  (Id. at 188.)

### E. October 30, 2007: Report of Contact by Disability Analyst G. Grabow

On October 30, 2007, New York State Disability Analyst G. Grabow ("Mr. Grabow") filed a Report of Contact ("Contact Report") summarizing contact with an individual identified as plaintiff's "therapist," who appears to be plaintiff's primary therapist from St. George, Ms. Fratto.[13]  (Id. at 129).  The Contact Report summarized plaintiff's treatment timeline for bipolar disorder and alcohol dependence, which occurred from March 1 to 28, 2007, and resumed on June 28, 2007.  (Id.)  The Contact Report noted plaintiff's responsiveness and compliance with treatment and that plaintiff's most recent treatment, presumably by Ms. Fratto, occurred on October 29, 2007.[14]  (Id.) The Contact Report further states that, according to Ms. Fratto, plaintiff had last seen a psychiatrist on October 15, 2007.[15] (Id.)  The Contact Report also notes that plaintiff had given

---

[13]    In the Contact Report, Mr. Grabow described his contact with "Dominica," an individual identified as plaintiff's "therapist" whom Mr. Grabow contacted at telephone number (718) 818-5102.  (Tr. 129.)  This contact thus appears to refer to communications with plaintiff's primary care therapist at St. George, Ms. Domenica Fratto, whose telephone number is listed as (718) 818-5106.  (See id. at 207.)

[14]    The administrative record contains no medical report from St. George dated October 29, 2007.

[15]    The administrative record contains no medical report from a psychiatrist dated October 15, 2007.

birth to a baby at the end of September 2007, and that there was
no current evidence of alcohol abuse by plaintiff.  (Id.)

In the Contact Report, Mr. Grabow noted that
plaintiff's current symptoms included episodes of rage that were
being alleviated with full medication compliance, and that
plaintiff exhibited no other psychotic symptoms at that time.
(Id. at 129.)  Mr. Grabow also reported that, according to Ms.
Fratto, plaintiff had gained impulse control and wanted to
concentrate on raising her children.  (Id. at 129.)

On November 1, 2007, agency psychiatrist Dr. J. Kessel
("Dr. Kessel") completed a "Psychiatric Review Technique"
worksheet ("PRT Worksheet") after reviewing plaintiff's medical
records.[16]  (Id. at 189-202.)  Dr. Kessel indicated that
plaintiff suffered from a Affective Disorders, specifically a
"disturbance of mood, accompanied by full or partial manic or
depressive syndrome evidenced by bipolar syndrome," as well as
Substance Addiction Disorders, more specifically "alcohol abuse
in remission."  (Id. at 189, 192, 197.)  Dr. Kessel noted that
plaintiff was "currently abstinent from active substance abuse."
(Id. at 197.)  Dr. Kessel found that, as of November 1, 2007, it

---

[16]     Regulations require completion of a PRT worksheet by a qualified
professional.  See 20 C.F.R. § 404.1520a(e)(1) (at the "initial and
reconsideration levels of administrative review . . . a medical or
psychological consultant . . . will complete" a PRT Worksheet).

would be necessary for an ALJ to assess plaintiff's residual functional capacity ("RFC").[17]  (Id. at 189.)

Additionally, in a function report ("Function Report") from the New York State Office of Temporary and Disability Assistance, Division of Disability Determinations, signed by plaintiff on July 4, 2007 (id. 119-126), plaintiff reported that she lacked the ability to motivate herself to do anything, had difficulty sleeping, was unable to perform basic chores efficiently, and had trouble showering (id. at 120).  In the Function Report, plaintiff described that she needed her cousin's assistance to take care of personal needs and prepare meals.  (Id. at 121.)  Plaintiff reported that she was not going out because she was nervous, scared, and was having panic attacks.  (Id. at 122.)  Plaintiff also reported that she was able to shop one to two times a week and was easily agitated by other people.  (Id. at 123-24.)

The SSA received an undated letter from Ms. Fratto apparently on December 11, 2007, based on the facsimile date stamp on the top of the letter.  (Id. at 207.)  In the letter, Ms. Fratto confirmed plaintiff's enrollment in the St. George

_____

[17]    Under the SSA regulations, the ALJ is responsible for assessing a claimant's RFC, or "the most [a claimant] can still do despite [the] limitations" caused by a medically determinable impairment, "based on all the relevant evidence in [the claimant's] case record."  20 C.F.R. §§ 404.1520(e); 416.920(e); 404.1545; 416.945.

program since June 28, 2007 for treatment of bipolar disorder and alcohol abuse.  (Id.)  In the letter, Ms. Fratto also reported that, apparently as of December 11, 2007, "despite issues with attendance, plaintiff continue[d] to remain engaged in outpatient services, keep[] all appointments with psychiatric staff for medication management[,] and to remain compliant with prescribed medications," including daily self-administered Invega for psychiatric symptoms.  (Id.)

### III. Procedural History

Plaintiff applied for SSI and SSD benefits on June 7, 2007, alleging disability since December 8, 2006.  (Tr. 75, 78.) The Commissioner denied plaintiff's claim on November 2, 2007. (Id. at 33.)  Plaintiff then requested and obtained a hearing before Administrative Law Judge Robert C. Dorf ("the ALJ"). (Id. at 18-30.)  The ALJ hearing took place on January 12, 2009, at which time plaintiff testified and was represented by counsel.  (Id.)

On February 23, 2009, the ALJ issued a decision denying plaintiff's claims after de novo review pursuant to the five-step sequential evaluation process for determining whether an individual is disabled under the Act.  (Id. at 8-14.)

According to the ALJ, under step one, plaintiff had not engaged in substantial gainful activity since December 8,

15

2006.[18] (Id. at 10.) Under step two, the ALJ found that plaintiff's severe impairments included depression and substance abuse disorder.[19] (Id. at 11.) Under step three, the ALJ found that plaintiff's impairments met the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.[20] (Id.) Additionally, the ALJ reasoned that if plaintiff "stopped the substance use," the remaining limitations "would cause more than a minimal impact on [plaintiff's] ability to perform basic work activities" and thus she would continue to have severe impairments or a combination of impairments under the Act. (Id. at 12.) However, under step three of the regulations, the ALJ also held that if plaintiff "stopped the substance use," the combination of her impairments would not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.) Under step four, the ALJ opined that if plaintiff "stopped the substance use," she would have the residual functioning capacity to perform work with mild limitations in concentration and interacting with others.[21] (Id. at 13.) The ALJ also found that if plaintiff "stopped the substance use," she would be able to perform past relevant work as a waitress.

---

[18] See 20 C.F.R. §§ 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.
[19] 20 C.F.R. §§ 404.1520(c) and 416.920(c).
[20] 20 C.F.R. §§ 404.1520(d) and 416.920(d).
[21] 20 C.F.R. §§ 404.1565 and 416.965.

(Id.)  Based on this analysis, the ALJ found that "the substance use disorder [was] a contributing factor material to the determination of disability," and that plaintiff was not disabled within the meaning of the Act during the alleged time period.  (Id. at 14.)

On November 9, 2009, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review.  (Id. at 1-3.) Proceeding *pro se*, plaintiff filed this complaint on January 8, 2010, alleging that she is entitled to receive SSI and SSD benefits due to severe medically determinable impairments, including "bipolar disease, severe depression, panic and anxiety attacks," which plaintiff alleges rendered her disabled and have prevented her from performing any work.  (See Compl. at 1.)  In her complaint, plaintiff alleged that the ALJ's decision "was erroneous, not supported by substantial evidence on the record and/or [was] contrary to the law."  (Id. at 2.)

On July 21, 2010, defendant served plaintiff with a copy of its motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  (See Def. Mot; see also ECF No. 14, Letter dated 7/21/2010 regarding service of defendant's motion.)  Despite being served with a copy of defendant's motion, plaintiff failed to respond as required by

August 23, 2010, and further failed to respond to this court's order dated September 21, 2010, informing plaintiff that failure to serve an opposition by October 22, 2010 would prompt the court to consider the motion unopposed. (See Order dated 9/21/2010; see also ECF No. 16, Letter to plaintiff dated 9/21/2010 enclosing 9/21/2010 Order.) Absent any response from plaintiff, defendant submitted the instant motion unopposed on October 27, 2010. (See ECF No. 21, Letter dated 10/27/2010 enclosing unopposed motion.) Approximately five months later, in March 2011, counsel appeared on behalf of plaintiff and requested, on consent of defendant, an extension of time within which to file a response to defendant's pending motion. (See Pl. March 2011 Ltrs.) Because the court had previously granted plaintiff a generous two-month extension of time, and because the matter was already under the court's consideration, the court denied plaintiff's belated request for an extension of time to file her opposition and proceeded to consider the defendant's motion unopposed. (See 4/1/2011 Order.)

**DISCUSSION**

I.  **Standard of Review**

   **A. Legal Standards Governing Agency Determinations of Eligibility to Receive Benefits**

   1. The Commissioner's Five-Step Analysis of Disability Claims

   A claimant is disabled under the Social Security Act when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be of "such severity" that the claimant is "not only unable to do [her] previous work but cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work [that] exists in the national economy." Id. at § 423(d)(2)(A).

   To determine if a claimant is disabled under the Act, the SSA requires that the ALJ conduct a five-step sequential analysis finding each of the following: "(1) . . . the claimant is not working, (2) that [she] has a severe impairment, (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability . . . (4) that the claimant is not capable of continuing in [her] prior type of work . . . [and] (5) there is

[no other] type of work [that] the claimant can do." Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008) (quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)) (internal citations omitted, first alteration in original); see also 20 C.F.R. § 404.1520a.

During this five step process, the Commissioner must "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity to establish eligibility for Social Security benefits." Burgin v. Astrue, 348 F. App'x 646, 647 (2d Cir. 2009) (citing 20 C.F.R. § 404.1523) (internal citations omitted). In cases where "the disability claim is premised upon one or more listed impairments . . . the [Commissioner] should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment." See Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982). Further, if the Commissioner "do[es] find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process." See Burgin, 348 F. App'x at 647 (citing 20 C.F.R. § 416.945(a)(2)).

In steps one through four "of the sequential five-step framework," the claimant bears the "general burden of proving .

. . . disability." <u>Burgess</u>, 537 F.3d at 128 (<u>quoting</u> <u>Butts v.</u>
<u>Barnhart</u>, 388 F.3d 377, 383 (2d. Cir. 2004)).  In step five, the
burden shifts from the claimant to the Commissioner, requiring
the Commissioner to show that in light of the claimant's RCF,
age, education, and work experience, the claimant is "able to
engage in gainful employment within the national economy."
<u>Sobolewski v. Apfel</u>, 985 F. Supp. 300, 310 (E.D.N.Y. 1997).

Further, "ALJs, unlike judges, have a duty to
affirmatively develop the record in light of the essentially
non-adversarial nature of the benefits proceedings."  <u>Anderson</u>
<u>v. Astrue</u>, No. 07-CV-4969, 2009 WL 2824584, at *7 (E.D.N.Y. Aug.
28, 2009) (<u>quoting</u> <u>Tejada v. Apfel</u>, 167 F.3d 770, 774 (2d Cir.
1999)); <u>see also</u> 20 C.F.R. § 702.338.

2. <u>The "Special Technique" for Evaluations of Mental</u>
<u>Impairments</u>

In addition to the five-step process outlined in 20
C.F.R. § 404.1520a, the SSA "has promulgated additional
regulations governing the evaluation . . . of the severity of
mental impairments," that should be applied "at the second and
third steps of the five-step framework, and at each level of
administrative review."  <u>Kohler v. Astrue</u>, 546 F.3d 260, 266 (2d
Cir. 2008) (citation omitted).  This "special technique"
requires "the reviewing authority to determine first whether the
claimant has a medically determinable mental impairment, [and

if] there is such impairment, the reviewing authority must rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph C of the regulations, which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation."[22]  Id. (internal citations omitted); see also 20 C.F.R. § 404.1520a(b)-(c).

Under the regulations, "if the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified . . . the reviewing authority . . . will conclude that the claimant's mental impairment is not 'severe' and will deny benefits."  Kohler, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(d)(1)).  However, if claimant's mental impairment or combination of impairments is severe, "in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder," the reviewing authority must "first compare the relevant medical findings [along with] the functional limitation rating to the

---

[22]    "Episodes of decompensation" are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  United States Social Security Administration, Disability Evaluation Under Social Security (September 2008), § 12.00, *available at* http://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm.

criteria of listed mental disorders."  Id. (citing
§ 404.1520a(d)(2)).  If the mental impairment is equally severe
to a listed mental disorder, the "claimant will be found to be
disabled."  Id.  "If not, the reviewing authority [must then]
assess" plaintiff's RFC.  Id. (citing 20 C.F.R.
§ 404.1520a(d)(3)).

Pursuant to the ALJ's duty to develop the record, the
application of this process must be documented at the "initial
and reconsideration levels of administrative review," where "a
medical or psychological consultant . . . will complete a" PRT
Worksheet.  Id. (citing § 404.1520a(e)(1)).

### 3.  Standard for Material Effect of Substance Abuse

The 1996 Amendments to the Social Security Act state
that "an individual shall not be considered to be disabled . . .
if alcoholism or drug addiction would . . . be a contributing
factor material to the Commissioner's determination that the
individual [was] disabled."  Mims v. Apfel, No. 98-6252, 1999 WL
376840, at *1 (2d. Cir. June 2, 1999); see also 42 U.S.C.
§ 1382c(a)(3)(J)(Supp. II 1996).  In determining whether alcohol
or substance abuse is material to the determination of
disability, the key factor is whether the Commissioner would
still find the claimant disabled if she stopped using the
alcohol or substance.  20 C.F.R. §§ 404.1535(b)(1);

23

416.935(b)(1).

Under the regulations, where there is evidence of alcoholism or drug use, the Commissioner must determine which physical and mental limitations would remain in the absence of substance abuse and whether these limitations would be disabling on their own. 20 C.F.R. §§ 404.1535(b)(2); 416.935(b)(2). If the remaining limitations would still be disabling to the claimant on their own, then the claimant is entitled to SSI and SSD benefits. 20 C.F.R. §§ 404.1535(b)(2)(ii); 416.935(b)(2)(ii). If the remaining limitations would not be disabling on their own, then the alcohol or substance abuse is considered material; and the claimant would not be eligible for benefits. 20 C.F.R. §§ 404.1535(b)(2)(i); 416.935(b)(2)(i).

4. <u>Treating Physician Rule and Weight to be Afforded to Other Medical Evidence</u>

"Regardless of its source," the regulations require that "every medical opinion" in the administrative record be evaluated when determining whether a claimant is disabled under the Act. 20 C.F.R. §§ 404.1527(d), 416.927(d). "Acceptable medical sources" that can provide evidence to establish an impairment include, *inter alia,* plaintiff's licensed treating physicians and licensed or certified treating psychologists. <u>See</u> 20 C.F.R. §§ 404.1513(a), 416.913(a). In addition, the SSA may rely on "other sources" to provide evidence of "the severity

24

of [a plaintiff's] impairment."  20 C.F.R. § 404.1513(d).  Such
other sources include, *inter alia*, other medical professionals
including social workers, as well as non-medical sources such as
caregivers, parents, and siblings.  Id.  In addition, in certain
cases the SSA will pay for a qualified consultative physician to
provide a physical or mental examination of a claimant.  20
C.F.R. § 404.1517; see also 20 C.F.R. §§ 404.1519; 404.1519g.

        Under the regulations, the medical opinion of a
treating physician or psychiatrist will be given "controlling"
weight if that opinion "is well-supported by medically
acceptable clinical and laboratory diagnostic techniques and is
not inconsistent with the other substantial evidence in [the]
record."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also
Burgess, 537 F.3d at 128 (citing Green-Younger, 335 F.3d at
106).  Medically acceptable clinical and laboratory diagnostic
techniques include consideration of a "patient's report of
complaints, or history, [a]s an essential diagnostic tool."
Green-Younger, 335 F.3d at 107.

        In addition, opinions from "other sources," which are
not considered "acceptable medical sources" under the
regulations, are "important and should be evaluated on key
issues such as impairment severity and functional effects."
Anderson, 2009 WL 2824584 at *9 (citing SSR 06-03p, Titles II

and XVI; Considering Opinions and Other Evidence From Sources Who are Not "Acceptable Medical Sources" in Disability Claims, 2006 WL 2329939, at *3 (Aug. 9, 2006)).  Particularly, reports from social workers who treated a plaintiff are particularly important, and thus may play a "vital role in the determination of the effect of [a plaintiff's] impairment[s]," if the social worker's opinion is the "sole [treating] source that had a regular treatment relationship with the plaintiff."  White v. Comm'r of Soc. Sec., 302 F. Supp. 2d 170, 176 (W.D.N.Y. 2004) (citing Bergman v. Sullivan, No. CIV-88-513L, 1989 WL 280264, at *1 (W.D.N.Y. Aug. 7, 1989) ("other source" evidence from a medical professional "concerning the nature and degree of plaintiff's impairment is not only helpful, but critically important, . . . [when she] is the only treating source")).

　　　According to the regulations, where a treating physician's opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it deserves controlling weight because "[such] sources are likely to be [from] the medical professionals most able to provide a detailed [and] longitudinal picture of [the plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from

the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

By the same logic, the opinion of a consultative physician, "who only examined a plaintiff once, should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist."  Anderson, 2009 WL 2824584 at *9 (citing Spielberg v. Barnhart, 367 F. Supp. 2d 276, 282-83 (E.D.N.Y. 2005)).  This is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day."  Anderson, 2009 WL 2824584 at *9 (citing Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1992)).

Pursuant to the ALJ's duty to develop the administrative record, an ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record."  Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*.")).  Further, even when a treating physician's opinion is not afforded controlling weight, the ALJ must "comprehensively set forth [his or her]

reasons for the weight assigned to a treating physician's opinion." Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004); see also Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); 20 C.F.R. § 404.1527(d)(2) (stating that the SSA "will always give *good reasons* in [its] notice of determination or decision for the weight [given to a] treating source's opinion") (emphasis added). "The failure to provide 'good reasons' for not crediting a treating source's opinion is ground for remand." See Burgin, 348 F. App'x at 648 (quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004) (the Second Circuit "[will] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and . . . will continue remanding when [the court] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." (changes in original omitted))).

While the regulations do not explicitly or exhaustively define what constitutes a "good reason" for the weight given to a treating physician's opinion, the following factors enumerated in the regulations may guide an ALJ's determination of what weight to give a treating source opinion: "(1) the length, frequency, nature, and extent of the treating relationship, (2) the supportability of the treating source

28

opinion, (3) the consistency of the opinion with the rest of the record, (4) the specialization of the treating physician, and (5) any other relevant factors." Scott v. Astrue, No. 09-CV-3999, 2010 WL 2736879, at *9 (E.D.N.Y. July 9, 2010); see also 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6). These same factors may guide an evaluation of the opinions of "other sources," such as licensed social workers. Canales v. Comm'r of Soc. Sec., 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010) (citing SSR 06-03p, 2006 WL 2329939, at *2-3 (Aug. 9, 2006)).

Notably, under this rubric it is possible for the opinion of a non-acceptable medical source with a particularly lengthy treating relationship with the claimant to be entitled to greater weight than an "acceptable medical source" such as a treating physician who has rarely had contact with the claimant. See Saxon v. Astrue, No. 08-CV-00178, 2011 WL 835895, at *8 (N.D.N.Y. March 4, 2011) (citing Anderson, 2009 WL 2824584 at *9). Accordingly, even if an ALJ is "free to conclude that the opinion of "non acceptable source," such as a "licensed social worker [is] not entitled to any weight, the ALJ . . . [must] explain that decision." Canales, 698 F. Supp. 2d at 344 (remand appropriate where ALJ disregarded social worker's opinion "simply because it was the opinion of a social worker,

not on account of its content or whether it conformed with the other evidence in the record").

### B. The Substantial Evidence Standard for Federal Court Review of Agency Determinations

The district court is empowered to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of [the Commissioner], with or without remanding the case for a rehearing." 42 U.S.C. § 405(g); see also Anderson, 2009 WL 2824584 at *7. Further, "[a] district court may set aside the [ALJ's] determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess, 537 F.3d at 127 (internal citations omitted). If substantial evidence exists in the record to support the Commissioner's factual findings, they are conclusive and must be upheld. 42 U.S.C. § 405(g); see Tejada, 167 F.3d at 774. The "[s]ubstantial evidence" standard requires "more than a mere scintilla," and is met where there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran, 362 F.3d at 31 (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). An evaluation of the "substantiality of the evidence must . . . include that which detracts from its weight." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).

Accordingly, the reviewing court "may not substitute its own judgment with that of the [ALJ], even if it might justifiably have reached a different result upon a *de novo* review." Jones v. Sullivan*,* 949 F.2d 57, 59 (2d Cir. 1991) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). Yet absent substantial evidence, or where the reviewing court is "unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer explanation for the decision," remand is appropriate. Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996) (quoting Berry, 675 F.2d at 469 (internal citations omitted)).

Indeed, in light of the ALJ's duty to develop the record, a court should "not hesitate to remand the case for further findings or a clearer explanation for the decision." Berry, 675 F.2d at 469. In addition, where an ALJ fails to explain and "give good reasons for failing to give good weight" to a treating physician's opinion, this court can give instructions to "expressly consider [claimant's] combined impairments, . . . and [to] provide good reasons for giving that opinion more or less weight than the other medical evidence." Burgin*,* 348 F. App'x at 649; see also Halloran, 362 F.3d at 33 (a court should "not hesitate to remand where the Commission has

not provided 'good reasons' for the weight given to a treating physician[']s opinion and . . . will continue remanding when [the court] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." (changes in original omitted)).

## II. Application

### A. In Addition to Depression and Substance Abuse Disorder, Plaintiff's Anxiety and Bipolar Diagnoses Are Separate Impairments and Must Be Considered in Determining Disability

The ALJ's failure to consider the combined effect of plaintiff's separate impairments requires remand.

The Commissioner must consider "the combined effect of all of the [plaintiff's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity" to establish plaintiff's eligibility for SSI or SSD benefits. Burgin, 348 F. App'x at 647. Further, if the Commissioner "do[es] find a medically severe combination of impairments, the combined impact of [those] impairments [should] be considered throughout the disability determination process." See id. (citing 20 C.F.R. § 404.1523). Specifically, when "medical evidence in the administrative record shows that [plaintiff's] depression and bipolar disorder are considered professionally as separate diagnoses," the ALJ must consider plaintiff's combined impairments when assessing how those

impairments affect her "social functioning, concentration, persistence, or pace."  Burgin, 348 F. App'x at 648.

Ample evidence in the administrative record here demonstrated that plaintiff had received multiple separate medical diagnoses.  Thus, in addition to diagnoses of depression and alcohol abuse, on multiple occasions plaintiff also received separate diagnoses of bipolar disorder and anxiety from a variety of treating and non-treating sources including both physicians and social workers.  (Tr. at 129, 155-56, 170, 177-78, 181, 188, 192, 207.)  Specifically, evidence of plaintiff's anxiety diagnosis includes Ms. Fratto's initial referral of plaintiff to St. George for further treatment of anxiety, alcohol use, and depression on March 1, 2007.  (Id. at 155-56.) In addition, on July 3, 2007, Dr. Hahn diagnosed plaintiff with "adjustment disorder with mixed anxiety and depressed mood" in addition to alcohol abuse.  (Id. at 188.)  Similarly, with respect to plaintiff's bipolar disorder diagnosis, Ms. Fratto and Dr. Akhtar, as reviewed by Dr. Izrayelit, as well as Ms. Wullbrandt diagnosed plaintiff with bipolar disorder on June 14 and 28, 2007, respectively.  (Id. at 170, 181.)  Additionally, Mr. Grabow's Contact Report dated October 30, 2007 described plaintiff's "treatment timeline for bipolar disorder and alcohol dependence between March 1 through 28, 2007."  (Id. at 129.)

Further evidence of plaintiff's bipolar disorder diagnosis
includes Dr. Hahn's report from July 3, 2007, acknowledging
plaintiff's "bipolar [disorder] and clinical depression," (id.
at 187), and Dr. Kessel's assessment of plaintiff for "bipolar
syndrome," on the PRT Worksheet. (Id. at 192.)

Yet in considering this evidence and determining that
plaintiff is not disabled under the Act, the ALJ failed to
meaningfully consider the combination of plaintiff's separate
diagnoses of depression, bipolar disorder, anxiety, and alcohol
abuse. Thus, when determining whether plaintiff has a "severe
impairment" under step two of the regulations, the ALJ found
that plaintiff's severe impairments included only "depression
and substance abuse disorder." (Id. at 12.) Further,
notwithstanding the ALJ's bare acknowledgment of plaintiff's
bipolar disorder and anxiety diagnoses during step three of the
analysis (see id. at 11), there is no indication that the ALJ
accounted for or meaningfully considered plaintiff's separate
additional diagnoses of anxiety or bipolar disorder during the
entirety of the five-step sequential analysis as required by the
regulations.

The ALJ's failure to consider the effects of
plaintiff's combined impairments in every step of the five-step
sequential process thus requires remand. See Burgin, 348 F.

App'x at 648-49 (remand is appropriate where the ALJ failed to consider plaintiff's combined impairments, including separate diagnoses of bipolar disorder and depression, throughout the entire disability determination process).[23]

## B. The ALJ's Finding that Plaintiff's Substance Abuse Was a Contributing Factor Material to the Disability Determination is Not Supported by Substantial Evidence

The ALJ found that because "[plaintiff's] substance use disorder [was] a contributing factor material to the determination of disability," plaintiff was not disabled within the meaning of the Act during the period following plaintiff's alleged disability onset date of December 8, 2006. (Tr. at 14.) Because it is not apparent whether substantial evidence in the record as a whole supports a finding that plaintiff's substance abuse was a material contributing factor to her disability, remand is required.

As a whole, the administrative record appears to indicate that plaintiff's multiple diagnoses of severe mental impairments occurred during a period of ongoing sobriety. Thus, plaintiff's medical reports and testimony from the

---

[23]    As discussed *infra*, to the extent that the ALJ gave less weight to plaintiff's diagnoses of bipolar disorder or anxiety because those diagnoses were made by social workers Ms. Fratto or Ms. Wullbrandt, in addition to other licensed physicians who qualify as "acceptable medical sources," the ALJ failed to explain the weight given to plaintiff's treating medical professionals.  See Canales, 698 F. Supp. 2d at 344 (even if the ALJ concludes that the opinion of a "non acceptable source" such as a licensed social worker should not be given weight, remand is appropriate where the ALJ fails to explain that decision).

administrative hearing indicate that plaintiff stopped drinking at some point between February 2007 and March 13, 2007.  (Id. at 28, 29, 129, 167, 179.)  Yet after plaintiff's cessation of alcohol abuse, plaintiff's treating sources repeatedly diagnosed her with various mental impairments, including depression, anxiety, bipolar disorder, and adjustment disorder.  (Id. at 143-44, 160, 170, 181.)  In the context of this evidence, to support the conclusion that plaintiff's substance abuse was material to her disability, the ALJ gave weight to the "opinion of . . . consultative examining physician [Dr. Hahn] and the reports from the [St. George] program."  (Id. at 13.)  Neither source appears to support the ALJ's finding with substantial evidence.

First, Dr. Hahn diagnosed plaintiff with adjustment disorder with mixed anxiety and depressed mood as well as alcohol abuse.  (Id. at 188.)  Yet, the ALJ failed to give good reasons for giving that opinion such weight above the opinions of the plaintiff's other mental health providers in determining that plaintiff's alcohol abuse was a material contributing factor to her disability.  See Halloran, 362 F.3d at 31 (the Commissioner is required to provide "good reasons" for the weight she gives to the treating source's opinion); see also Snell, 177 F.3d at 133; 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2) (stating that the SSA "will always give *good reasons* in [its] notice of determination or decision for the weight [given to a] treating source's opinion") (emphasis added).

Second, with regard to the St. George records, the ALJ cited only a single page (the "cited page") of the St. George records to support his conclusion that plaintiff's substance abuse was material. (Tr. 13, 177.) Yet that cited page merely summarizes plaintiff's "history of present illness" by describing plaintiff's past history of alcohol and substance abuse as recounted by Ms. Fratto in the medical report from plaintiff's June 28, 2007 visit to St. George. (Id.) Notably, the cited page does not reference actual medical findings from the June 28, 2007 medical report, even though that visit is within the period for which plaintiff claims disability. (Id.) Moreover, plaintiff's then-existing diagnoses of anxiety, bipolar disorder, and depression post-date plaintiff's substance abuse problems as reported in the "history of present illness" section of the St. George record. Therefore, the portions of the record identified by the ALJ fail to support the ALJ's finding that plaintiff's substance abuse was a material contributing factor in plaintiff's disability.

Both the medical evidence from the administrative record not cited by the ALJ as well as the medical evidence relied upon by the ALJ indicate that plaintiff's repeated diagnoses and treatment for depression, anxiety, and bipolar disorder occurred when plaintiff was sober. It is therefore unclear whether the ALJ considered whether plaintiff's past alcohol abuse caused her mental impairments, or *vice versa,* or whether her separate mental impairments and alcohol abuse disorder simply co-existed in the past. Moreover, the ALJ apparently failed to consider the effect of plaintiff's current abstinence on her mental impairments.

It is therefore unclear how the ALJ concluded that plaintiff's alcohol abuse was a material contributing factor to plaintiff's mental impairments during a period of sobriety. See Mitchell v. Astrue, No. 07 Civ. 0285, 2009 WL 3096717, at *21 (S.D.N.Y. Sept. 28, 2009) (when a claimant's treating physicians reported separate diagnoses of bipolar disorder and other psychiatric conditions along with substance abuse disorder, a diagnosis of claimant's substance induced mood disorder found in the administrative record did not support the ALJ's conclusion that claimant's bipolar condition would not be disabling in the absence of substance abuse). Without further findings or a

clearer explanation by the ALJ,[24] this court is unable to

ascertain the ALJ's rationale for the finding that substance

abuse is material to plaintiff's disability in relation to the

evidence in the record, and remand is required.  See Pratts v.

Charter, 94 F.3d 34, 39 (2d Cir. 1996) (Remand is particularly

appropriate where the court is "unable to fathom the ALJ's

rationale in relation to the evidence in the record without

further findings or clearer explanation for the decision.")

(quoting Berry, 675 F.2d at 469 (internal citations omitted)).

### C. The ALJ Failed to Explain the Weight Afforded to Plaintiff's Medical Evidence

Remand is also required because the ALJ failed to give

good reasons for the weight accorded to the medical evidence in

the record including the opinions of plaintiff's treating

physicians and other mental health professionals, and failed to

adequately develop the record.

Pursuant to the ALJ's duty to develop the record, "the

ALJ must always give good reasons . . . for the weight accorded

to a treating source's medical opinion."  Anderson, 2009 WL

2824584 at *9; see also 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2).  Further, although an ALJ is free to conclude

---

[24]   As discussed infra, to the extent the ALJ afforded less weight to the opinions of plaintiff's treating therapists, specifically social workers Ms. Fratto and Ms. Wullbrandt, the ALJ must explain that decision.  See Canales, 698 F. Supp. 2d at 344.

that the opinion of a "non acceptable source," such as a licensed social worker, is not entitled to any weight, the ALJ must explain that decision.  See Canales, 698 F. Supp. 2d at 344.  Indeed, "other source evidence," including reports from social workers, may play a "vital role in the determination of the effect of [plaintiff's] impairment," especially where a social worker was the "sole [treating] source that had a regular treatment relationship with the plaintiff."  White v. Comm'r of Soc. Sec., 302 F. Supp. 2d 170, 176 (W.D.N.Y. 2004) (citations omitted).

As discussed above, the ALJ appeared to rely almost exclusively on the opinions of the consultative physician Dr. Hahn and a single evaluation from St. George in March 2007 when determining that plaintiff is not disabled under the Act.  (Tr. 11-12.)  Yet the ALJ failed to provide any reasons for not giving weight to opinions from plaintiff's treating physicians or other mental health professionals.  See 20 C.F.R. §§ 404.1527(d) and 416.927(d).

First, with respect to treating physicians, the ALJ failed to give good reasons for not giving weight to the opinions of Dr. Akhtar and Dr. Idowu, following plaintiff's June 28, 2007 visit to St. George, when Drs. Akhtar and Idowu, with Ms. Fratto, diagnosed plaintiff with bipolar disorder.  (Tr.

176-82.)  Further, the ALJ failed to give good reasons for not giving weight to plaintiff's treating physician's opinion following her visit to Lenox Hill Hospital on May 7, 2007, where Dr. Weissbart separately diagnosed plaintiff with severe depression.  (Id. at 145.)

Second, the ALJ's decision lacks any discussion of which factors, if any, the ALJ considered when deciding to afford more weight to the March 6, 2007 St. George record and the consultative physician report from Dr. Hahn as opposed to opinions from plaintiff's other mental health providers, including social workers.  See Canales, 698 F. Supp. 2d at 344 (citing SSR 06-03p, 2006 WL 2329939, at *2-3) (same factors should be used to evaluate weight for opinions of "acceptable medical sources" as well as opinions of "other sources," such as licensed social workers).  The lack of "good reasons" for failing to consider plaintiff's "other source" evidence is particularly critical in this case, considering that despite being a non-acceptable medial source, plaintiff's primary therapist and social worker, Ms. Fratto, appears in the record as the sole treating source who engaged in a regular treating relationship with plaintiff.  See Bergman, 1989 WL 280264, at *1 (noting that "other source" evidence from a medical professional "concerning the nature and degree of plaintiff's impairment is

41

not only helpful, but critically important, . . . [when she] is the only treating source").

Third and finally, the ALJ failed in other respects to develop the record, including by failing to identify and request records from psychiatrists who may have treated plaintiff. Thus, for example, although Mr. Grabow and Dr. Hahn both referred in their reports to plaintiff's receipt or intended receipt of psychiatric treatment (see Tr. 129, 185), the record is devoid of records, or efforts to locate records from any treating psychiatrists.

Because the ALJ failed to give any reasons for affording more weight to some of plaintiff's treating sources above plaintiff's other treating sources, or to show any effort to fill gaps in the administrative record where such effort may have been necessary, remand is appropriate. See Schaal, 134 F.3d at 505 ("[E]ven if the clinical findings [are] inadequate, it [is] the ALJ's duty to seek additional information from [the treating physician] *sua sponte.*").

### CONCLUSION

For the foregoing reasons, the court denies defendant's motion for judgment on the pleadings and remands this case for further proceedings consistent with this opinion. Upon remand, the ALJ should:

(1) Expressly consider claimant's combined impairments, including anxiety, bipolar disorder, and major depression in every step of the five-step determination process, as required by 20 C.F.R. §§ 404.1523, 416.923.

(2) Weigh plaintiff's abstinence in considering plaintiff's combination of impairments that were diagnosed while plaintiff was abstinent from alcohol use; and

(3) Consider the opinions of all treating physicians and mental health providers and explain the weight afforded to opinions from plaintiff's mental healthcare providers, and affirmatively develop the record as necessary to fill any gaps in the administrative record.

The Clerk of the Court is respectfully requested to close the case.


**SO ORDERED**

Dated:     Brooklyn, New York
           April 29, 2011

                                    _____/s/_____
                                    **KIYO A. MATSUMOTO**
                                    United States District Judge
                                    Eastern District of New York